**Nathaniel SMITH, Appellee,**

v.

**E. L. PADERICK, Superintendent, Virginia State Penitentiary, Appellant.**

**No. 74–2386.**

United States Court of Appeals, Fourth Circuit.

Argued April 11, 1975.

Decided July 18, 1975.

Certiorari Denied Nov. 3, 1975. See 96 S.Ct. 293.

---

Linwood T. Wells, Jr., Asst. Atty. Gen. of Va. (Andrew P. Miller, Atty. Gen. of Va., on brief), for appellant.

Frederick D. Greco, McLean, Va. [court-appointed], for appellee.

Before HAYNSWORTH, Chief Judge, CRAVEN, Circuit Judge, and WARRINER, District Judge.

CRAVEN, Circuit Judge:

This is an appeal by the Commonwealth of Virginia, *ex rel.* Paderick, Superintendent of the Virginia State Penitentiary, from the granting by the district court of a writ of *habeas corpus* sought by Nathaniel Smith. The district court held that Smith had been denied due process at his state non-jury trial by the court's having admitted into evidence positive identification testimony that had been tainted by a pretrial confrontation thought to be impermissibly suggestive and conducive to irreparable misidentification. We disagree, and reverse.

I.

Smith and several other inmates escaped from Lorton Reformatory on August 15, 1972. Shortly before dawn of August 16 four black males and one white male broke into the home of Samuel Bradshaw near the Reformatory, tied up the occupants and ransacked the house for at least two hours, took several sets of Bradshaw's clothing, and fled in Bradshaw's car.

Immediately after the August 16 events a state investigator named Conahan took descriptions of their assailants from the Bradshaw family. He later testified that Bradshaw could describe only the white man and two of the blacks, and none of those in any detail.[1] The record is unclear whether one of the descriptions fitted Smith. Shortly after

giving these descriptions Bradshaw viewed a photographic spread of eight blacks and four whites, from which he was able to identify with confidence the white attacker and two of the blacks, and to identify Smith "tentatively." Smith does not claim this photographic spread was in any way suggestive.

Smith and four of his fellow escapees were caught before long and accorded a preliminary hearing before a state court on charges based upon invasion of the Bradshaw home. The presiding judge, commendably sensitive to the dangers of eyewitness identification, conducted an in-court lineup requiring that each defendant be seated in a separate group along with four other similarly attired persons of his same race, and that Bradshaw be brought into the courtroom to view the groups *seriatim* and attempt to identify his attackers. Under these conditions Bradshaw correctly identified all except Smith: in Smith's group Bradshaw picked someone who did not resemble Smith.

The judge dismissed the charges against Smith because of Bradshaw's failure to identify him, and excused Smith from the hearing so that Bradshaw could not view him further. Nevertheless, a grand jury a few days later indicted Smith for statutory burglary, two counts of abduction, and robbery in connection with the events at Bradshaw's home.

Before any further state court proceedings, Bradshaw was subpoenaed to testify in federal court at the escape trial of Smith and three other escapees (whom Bradshaw had successfully identified at the state preliminary hearing). Although Bradshaw notified Detective Conahan of the subpoena, neither Conahan nor any other state official informed Smith's state attorney of his client's impending confrontation with Bradshaw. Smith was represented at the federal trial by a different attorney. No lineup was held in the federal court; instead

---

1. Bradshaw testified at Smith's trial that he thought he had described all five of his assail- ants, but he admitted that he "wouldn't swear to it."

Bradshaw viewed Smith seated at counsel table with his three codefendants for at least ten minutes and made an in-court identification of all four as having been in his home on August 16.

When Smith's state attorney learned of this federal court confrontation, he moved to suppress any identification of Smith by Bradshaw on the ground that the confrontation had been irreparably prejudicial. The motion was denied. Smith's head was covered by a stocking cap during the motions hearing to avoid any further prejudicial viewing by Bradshaw.

Smith went to trial on March 20, 1973, before a judge sitting without a jury. His attorney renewed the motion to suppress any identification by Bradshaw because of the allegedly prejudicial confrontation, *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and added a contention that Smith's right to counsel had been denied, under *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), because his state attorney had not been present at the federal court confrontation even though Smith had already been indicted on the state offenses. The court again denied the motion.

The Commonwealth's case against Smith consisted of testimony by one James Tyson, who had already pleaded guilty to charges in connection with the break-in at Bradshaw's home, and testimony by Bradshaw. Tyson testified that Smith had escaped from Lorton with him and broken into Bradshaw's home with him and three others, although reluctantly, and had been present throughout the two or more hours at the house. Tyson was uncertain whether Smith had entered the bedroom where the Bradshaws were tied up, or whether Smith had taken any of Bradshaw's clothes.

Bradshaw testified that Tyson had tied him to his bed as soon as he woke up, that while tied down he had seen Smith once or twice in the hallway just outside his bedroom door, that Smith was wearing sunglasses at the time, and that he had no trouble identifying Smith in the courtroom. He admitted that he had only "tentatively" identified Smith in the photographic spread on the day of the break-in and that he had picked out the wrong person at the preliminary hearing. The following exchange then took place between Bradshaw and Smith's attorney:

Q. Now, did you ever see him again before today?

A. Yes, I did.

Q. And where was that, sir?

A. In Federal Court.

Q. And when you saw him, where was he?

A. In the Courtroom with the three other Defendants.

Q. And you had no difficulty picking him out there?

A. No, I didn't.

Q. And the fact that he was there with three other people whom you knew did not aid you in any way in determining he was in fact the person in your home on the 16th of August?

A. Did it aide me? I can't say. I can't honestly say.

At the conclusion of the trial the judge found Smith guilty of robbery and two counts of abduction, with the following comments:

I think considering the evidence as a whole, Mr. Greco [Smith's attorney], that it can prove beyond any reasonable doubt that Mr. Smith is guilty of each of these three remaining counts of the indictment. If it were only a portion of the evidence that was to be considered; for example, if it were only the testimony of Mr. Bradshaw, it could be that there could be some doubt about his [being] guilty.

But as I say, considering the evidence as [a] whole, I just don't think there is any doubt about that, and I

find you guilty, Mr. Smith, as charged in each of the three remaining counts in the indictment; that is Count 2, Count 3 and Count 4.[2]

## II.

The district judge found that Smith's rights under *Wade* and *Gilbert* had not been violated by his state counsel's absence during Smith's federal court confrontation with Bradshaw. But he held that the confrontation itself had been "unnecessarily suggestive and conducive to irreparable mistaken identification," *Stovall, supra,* 388 U.S. at 302, 87 S.Ct. at 1972,[3] and that the state judge's apparent reliance on Bradshaw's in-court identification denied Smith due process and required that his conviction be vacated.

■■■ We agree with the district judge that Smith's right to counsel was not violated in the federal court confrontation. Two factors convince us that the *Wade-Gilbert* rationale did not require the presence of Smith's state counsel.[4] First, the confrontation occurred in a courtroom under the supervision of a United States District Judge fully capable of guarding against undue influence or suggestion by the prosecutor or police during an identification, which was one of the functions envisioned for the defense counsel in *Wade*. *See* 388 U.S. at 228–30, 87 S.Ct. 1926; *cf.* N. Sobel, Eye-

Witness Identification: Legal and Practical Problems 43 (1972). And second, Smith was represented at the federal trial by counsel of unchallenged competence who, though apparently unaware of the pending state charges against Smith, certainly had sufficient independent reason to prevent any unnecessarily suggestive confrontation with Bradshaw: the identification testimony tended to prove escape as well as crimes committed at Bradshaw's home. In view of the Supreme Court's failure to condemn the use of "substitute counsel" rather than a suspect's own counsel in some circumstances, 388 U.S. 237 & n.27, 87 S.Ct. 1926, we decline to adopt a rule that would require the presence of state counsel at the federal trial and/or vice versa. Finally, another of the *Wade-Gilbert* purposes—to enable reconstruction at trial of the circumstances of the identification process—was fully served here by the state prosecutor's stipulation to the circumstances of the federal court identification as related by Smith's federal counsel.

The district court found that the federal court confrontation between Bradshaw and Smith violated due process after considering the "totality of the circumstances" as required by *Stovall, Simmons,* and *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In its view Bradshaw's courtroom viewing of Smith seated with three others

---

2. Counts 2, 3, and 4 were the robbery count and two abduction counts. The judge had previously dismissed Count 1, statutory burglary, because the evidence did not prove to his satisfaction that the entry of Bradshaw's home took place at night.

3. In *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), a case involving a photographic identification rather than a corporeal identification, the Supreme Court phrased the test for exclusion as whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Although the words differed from the phrasing used in *Stovall,* the Court stated that its *Simmons* phrasing "accorded with" its decision in *Stovall,* and we have previously stated our belief that the *Stovall* and *Simmons* tests are interchangeable. *See Stan-*

*ley v. Cox,* 486 F.2d 48, 50 n.5 (4th Cir. 1973), *cert. denied,* 416 U.S. 958, 94 S.Ct. 1975, 40 L.Ed.2d 309 (1974).

4. We agree with Smith that the Commonwealth was sufficiently implicated in the confrontation to arguably invoke *Wade* and *Gilbert* even though it took place in federal court at the instance of federal authorities. Bradshaw's call to Detective Conahan was sufficient notice to the Commonwealth, in our view, to remove this confrontation from the category of accidental or unarranged meetings to which *Wade* and *Gilbert* do not apply. *See* N. Sobel, Eye-Witness Identification: Legal and Practical Problems 39–41 (1972). Although the Commonwealth did not arrange this confrontation, it could have had a duty, we think, to inform Smith's state counsel of what was about to occur.

whom he had· identified, following his previous viewings of Smith in a photographic spread and a lineup, impermissibly suggested that the police thought Smith was one of his attackers. The court noted that other factors—Bradshaw's limited opportunity to view the man he later identified as Smith, his failure to describe him accurately, his misidentification at the preliminary hearing lineup, and his inability to say whether the federal court confrontation had aided him in his trial identification— all detracted from rather than shored up the reliability of Bradshaw's identification. *See Biggers, supra,* 409 U.S. at 199, 93 S.Ct. 375.

We share the district court's lack of confidence in Bradshaw's identification. Had Smith's state trial been to a jury we would be inclined to agree with him that failure to exclude it amounted to reversible error.[5] But Smith's case was tried to a judge, and that makes a difference. The line between an identification that is admissible but likely to carry little weight, and one that is inadmissible under *Stovall* because it is so untrustworthy as to violate due process, is not a bright one. *See Foster v. California,* 394 U.S. 440, 442 n.2, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). The Supreme Court has suggested approximate coordinates of the line in several jury trial cases, but has not indicated whether the line lies in the same place for both judge and jury trials. We think it does not.

The exclusionary rule of *Stovall* and *Biggers* was a response to the very appreciable danger of convicting the innocent. Positive identification testimony is the most dangerous evidence known to the law. That is true because it is easier to deceive ourselves than others: pressured to help solve a heinous crime, often conscious of a duty to do so, and eager to be of assistance, a potential witness may be readily receptive to subtle, even circumstantial, insinuation that the person viewed is the culprit.[6] Unless such a witness is far more introspective than most, and something of a natural-born psychologist, he is usually totally unaware of all of the influences that result in his say, "That is the man." And that enables him to speak with conviction and utter honesty—further enhancing the danger.

We have previously expressed our awareness of the danger and our confidence in experienced trial judges to guard against it. *United States v. Levi,* 405 F.2d 380, 383 (4th Cir. 1968). Tainted identification evidence cannot be allowed to go to a jury because they are likely to accept it uncritically. An experienced trial judge will doubtless receive it skeptically, and accord it no more weight than it deserves.

We are confirmed in our distinction between jury and non-jury trials by the trial judge's comment upon announcing his verdict. His statement that "if it were only the testimony of

---

5. The Commonwealth has cited us to several cases that it claims stand for the proposition that *Stovall* does not apply to inadvertent confrontations not arranged by the prosecution. E. g., *United States v. Hamilton,* 469 F.2d 880 (9th Cir. 1972); *United States ex rel. Riffert v. Rundle,* 464 F.2d 1348 (3d Cir. 1972), *cert. denied, Riffert v. Johnson,* 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974); *United States v. Seader,* 440 F.2d 488 (5th Cir. 1971), *cert. denied sub nom. Sandell v. United States,* 404 U.S. 826, 92 S.Ct. 56, 30 L.Ed.2d 54 (1971). We read those cases to have considered police complicity as simply one factor in the "totality of the circumstances." *See Hamilton, supra,* 469 F.2d at 883 n.3. 'We question whether police involvement in the actual confrontation is relevant to the due process issue at all, since it is not the confrontation itself so much as the use of a later identification prejudicially tainted by it that *Stovall* forbids. Moreover, although the Commonwealth did not arrange this confrontation, it knew of it, as we have pointed out in footnote 4, *supra.*

6. The phrasing of a question may suggest a desired response, e. g., "What color tie was he wearing? " is not likely to elicit "None" as the answer. The danger of suggestive questioning was illustrated by fact-skeptic Jerome Frank, later a judge of the Second Circuit, in observation experiments in his classes at the Yale Law School.

Mr. Bradshaw, it could be that there could be some doubt about his [being] guilty," clearly indicates that he continued to view Bradshaw's identification with misgivings even though he admitted it into evidence. We interpret his juxtaposition of that statement with the finding that "the evidence as a whole" showed Smith's guilt, as an indication that he relied heavily on the testimony of Tyson, the accomplice. Although accomplice testimony is to be viewed with caution, it is certainly competent and can be the basis of a conviction even without corroboration. *Gormley v. United States,* 167 F.2d 454 (4th Cir. 1948); *Largin v. Commonwealth,* 215 Va. 318, 208 S.E.2d 775, 776 (1974). The judge as trier of fact could choose to believe Tyson or not, and his comments show that he believed him. He was certainly warranted in his belief in Tyson's testimony, for it was substantially corroborated by the uncontroverted fact that Smith was one of the escapees that night. Tyson's story of the escape of Smith, the others and him, their fleeing to some woods but staying on the move until at sun-up they came to the Bradshaw home, is a natural sequel of the established escape.

With a jury's general verdict we would never know whether conviction rested solely on Tyson's testimony, equally on that and Bradshaw's identification, or wholly on the identification. But we know that the judge distrusted Bradshaw's identification and obviously credited Tyson's testimony. Given that knowledge, and the fact that we believe it a close question whether Bradshaw's identification was so tainted as to be excludable, we feel confident that allowing it in did not deprive Smith of due process.

*Reversed.*