# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v SAMMONS

Docket No. 156189. Argued on application for leave to appeal October 2, 2019. Decided March 16, 2020.

Travis T. Sammons was convicted after a jury trial in the Saginaw Circuit Court of conspiracy to commit murder, MCL 750.157a, in connection with the shooting death of Humberto Casas. DyJuan Jones and Rosei Watkins witnessed the shooting, which occurred on a street around 1 p.m. Jones was riding in the backseat of a car being driven by his mother when he heard the shots, and Watkins was driving with her grandson in her own car. Jones saw a light gray Jeep, its driver, and another man who was wielding a gun. Jones described both men as black and wearing white shirts. Jones described the driver as weighing about 320 pounds with a long beard, and the gunman as being bald and wearing black pants. Watkins thought the driver was of average build. Jones saw the gunman shoot a Hispanic man, later identified as Casas. Jones did not see the gunman get into the Jeep, but he saw the Jeep leave going 60 to 70 miles per hour. About 10 to 20 minutes later, the police pulled over defendant and Dominque Ramsey in a silver Jeep. Both men wore white shirts. Ramsey weighed about 150 pounds at the time, and had facial hair that one police officer characterized as short stubble. Although defendant had a short hairstyle, he was not bald. Both men were taken to the Saginaw Police Department, where they were detained. A photo of the Jeep was taken and shown to Watkins, who identified it as the Jeep from the shooting. Several hours later, Jones and his mother went to the police station, where Michigan State Police Detective Sergeant David Rivard organized a showup identification of defendant and Ramsey. According to Jones, he could identify neither man as having been involved in the shooting, while Rivard claimed that Jones identified defendant as the shooter but did not identify Ramsey. No one witnessed the conversation between Jones and the Rivard, the conversation was not recorded in any way, and Jones did not sign any kind of statement or report indicating that he had made an identification. At the preliminary examination, Jones repeatedly denied having identified the shooter. Defendant objected to Rivard's testimony about the showup identification and filed a motion to suppress this evidence. The circuit court, Darnell Jackson, J., denied the motion to suppress and, after a trial, the jury found both men guilty of conspiracy. Both men filed motions for a directed verdict or a new trial. The circuit court denied defendant's motion but granted Ramsey's, ruling that there was insufficient evidence to sustain his conviction. Defendant appealed. The Court of Appeals, TALBOT, C.J., and BECKERING and M. J. KELLY, JJ., affirmed defendant's conviction in an unpublished per curiam opinion issued July 6, 2017 (Docket No. 332190), and he sought leave to appeal. The Supreme Court ordered and heard oral argument on the application, directing the parties to file supplemental briefs addressing whether the showup

was impermissibly suggestive; if so, whether the identification was nonetheless reliable; and whether, if improperly admitted, any error was harmless. 503 Mich 910 (2018).

In an opinion by Justice CAVANAGH, joined by Chief Justice MCCORMACK and Justices VIVIANO, BERNSTEIN, and CLEMENT, in lieu of granting leave to appeal, the Supreme Court *held*:

The showup identification procedure employed in this case was suggestive because it indicated to the witness that the police suspected defendant. The suggestiveness was unnecessary because there was no reason, except perhaps police convenience, to use a suggestive procedure, and the showup was not reliable under *Neil v Biggers*, 409 US 188 (1972). This error was not harmless because the prosecution's case was significantly less persuasive without the showup. Accordingly, the Court of Appeals judgment was reversed.

1. Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures. Exclusion of evidence of an identification is required when the identification procedure was suggestive, the suggestive nature of the procedure was unnecessary, and the identification was unreliable. The inherently suggestive nature of showups has long been beyond debate, particularly when the showup is conducted in a police stationhouse, and the use of showups continues to receive critical treatment from courts and commentators.

2. The showup procedure in this case was suggestive because defendant was shown singly to the witness. Although the prosecution argues that Rivard did not suggest that either of the men was involved in a criminal investigation, Jones could plainly see that defendant and Ramsey were involved in a criminal investigation, given that they were the subjects of a showup. Further, Jones testified that he understood he was taken to see defendant for the purpose of making an identification. Also, neither the procedural safeguards recommended by the Prosecuting Attorneys Association of Michigan nor those recommended by the United States Department of Justice for conducting showups were used.

3. The showup in this case was not necessary. Defendant and Ramsey were arrested minutes after the shooting, and Jones did not arrive at the police station until 4 to 5 hours later. Further, there was nothing in the record to indicate that the police could not have taken more time if necessary to set up a corporeal or photographic lineup since defendant and Ramsey were in custody. The crime had been long over by the time the showup was conducted, and there was no ongoing danger that police were better able to address by dispensing with a reliable identification procedure.

4. The evidence produced by an unnecessarily suggestive identification procedure is not automatically excluded unless the improper police conduct created a substantial likelihood of misidentification. To determine whether an unnecessarily suggestive identification is nevertheless reliable, a court considers the nonexclusive list of factors set out in *Biggers*: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. In this case, Jones's opportunity to view the criminal at the time of the crime was poor. Although

Jones's attention was drawn to the shooting, he testified that he was not paying attention to the physical features of the person he was asked to identify. While the description Jones gave before viewing defendant and Ramsey matched them in a general sense, the most specific corroborating details he gave did not match: neither man was heavy, neither man was bald, and neither man had a long beard. Further, the partial license plate number that Jones remembered did not match that of the Jeep defendant and Ramsey were driving. Jones's level of certainty at the confrontation was difficult to evaluate because not only was it not documented, Jones denied even having made an identification. While the relatively short time between the crime and confrontation did provide some indicia of reliability, considering all the *Biggers* factors and other evidence relied on by the trial court, the prosecution did not meet its burden to show that the indicia of reliability were strong enough to outweigh the corrupting effect of the suggestive circumstances.

5. The error of admitting the evidence from the unnecessarily suggestive and unreliable showup was not harmless beyond a reasonable doubt. When evaluating whether erroneously admitted testimony was harmless beyond a reasonable doubt, a court must determine the probable effect of that testimony on the minds of an average jury. Reversal is required if the average jury would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony. In this case, without the showup, the prosecution's only evidence was a compilation of security camera videos and Watkins's identification of the Jeep, both of which were far from conclusive. Accordingly, the prosecution's case was significantly less persuasive without the showup identification evidence.

Court of Appeals judgment reversed; showup evidence suppressed; case remanded to the Saginaw Circuit Court for a new trial.

Justice ZAHRA, joined by Justice MARKMAN, dissenting, agreed that the identification procedure employed at the police station was suggestive and unnecessary but did not believe that the procedure was so unduly suggestive as to lead to a substantial likelihood of misidentification, noting that defendant and Ramsey appeared before Jones in separate interview rooms and in street clothes, unrestrained and unaccompanied by any law enforcement officers, with nothing to suggest to Jones or any objective observer that Ramsey and defendant were suspects in any crime. An application of the *Biggers* factors indicated that Jones had an ample opportunity to view the defendant given that Jones had an unobstructed view of the shooting, which occurred about 20 to 25 feet away on a clear, sunny afternoon; Jones paid detailed attention to the incident and remained calm throughout it; Jones accurately described defendant's general physical characteristics and clothing; and Jones's identification of defendant occurred while the incident was fresh in Jones's mind. Viewed under the totality of the circumstances and weighed against the corrupting effect of the suggestiveness of this procedure, and considering the more recent caselaw applying the *Biggers* factors, Jones's identification of defendant retained strong indicia of reliability, and therefore the trial court did not clearly err by admitting the evidence that Jones had identified defendant as the shooter. Justice ZAHRA would have affirmed the trial court and the Court of Appeals.

©2020 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED March 16, 2020

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 156189

TRAVIS TRAVON SAMMONS,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

Defendant, Travis T. Sammons, was convicted by a jury of conspiracy to commit open murder following a trial in which the jury was told that a witness identified defendant as the shooter during a "showup"[1] identification conducted by the police following the shooting. Defendant has appealed, arguing that the showup identification violated his

---

[1] A showup is "[a] police procedure in which a suspect is shown singly to a witness for identification . . . ." *Black's Law Dictionary* (11th ed).

constitutional right to due process, that the evidence of the showup should have been suppressed, and that he is entitled to a new trial. We agree. The questions necessary to resolve this appeal include: whether the identification procedure conducted by police was suggestive, whether any suggestiveness was necessary, whether the witness's identification was nonetheless reliable, and whether any error was harmless. We hold that the showup identification procedure was suggestive because it indicated to the witness that police suspected defendant; the suggestiveness was unnecessary because there was no reason, except perhaps police convenience, to use a suggestive procedure; and the showup was not reliable under *Neil v Biggers*, 409 US 188, 201; 93 S Ct 375; 34 L Ed 2d 401 (1972). Finally, the error was not harmless because the prosecution's case was significantly less persuasive without the showup. Accordingly, we reverse the Court of Appeals judgment, suppress any evidence from the showup, and remand to the Saginaw Circuit Court for a new trial. In light of this resolution, we decline to address defendant's remaining issues.

## I. FACTS AND PROCEDURAL HISTORY

Humberto Casas was shot on the street in Saginaw on June 21, 2015, at approximately 1:00 p.m. Sixteen-year-old DyJuan Jones witnessed the shooting, as did Rosei Watkins. Jones was riding in the backseat of a car being driven by his mother when he heard the shots, and Watkins was driving with her grandson in her own car. Jones saw a light gray Jeep, its driver, and another man who was wielding a gun. Jones did not note the model of the Jeep and "wasn't paying attention" to the gunman. Jones described both men as black and wearing white shirts. Jones described the driver as weighing about 320 pounds with a long beard, and the gunman as being bald and wearing black pants. Watkins,

2

on the other hand, thought the driver was of average build. Jones saw the gunman shoot a Hispanic man—Casas. The gunman fired three shots, and then paused as his gun seemed to jam. He then fired more shots. Jones did not see the gunman get into the Jeep, but he saw the Jeep leave going 60 to 70 miles per hour. Jones told the police that the Jeep's license plate number contained either "CE" or "GE." Jones and his mother, a nurse, initially left but then returned to the scene for her to render aid. Casas died from his injuries.

About 10 to 20 minutes later, the police pulled over defendant Travis Sammons and Dominque Ramsey in a silver Jeep Commander that had the license plate number DFQ 9593. Both men wore white shirts. Ramsey weighed about 150 pounds at the time, and had facial hair that one police officer characterized as "short stubble." Although defendant had a short hairstyle, he was not bald. The officer ordered Ramsey out of the Jeep, searched him, handcuffed him, and put him into the back of the patrol car. The officer then ordered defendant out of the Jeep and searched him. During the search, the officer noticed that defendant's hands were sweaty, which the officer found "pretty odd." With Ramsey's permission, the officer searched the Jeep. Nothing of interest was found in the searches of the men or the Jeep. Both men were taken to the Saginaw Police Department, where they were detained. A photo of the Jeep was taken and shown to Watkins, who identified it as the Jeep from the shooting.

Jones and his mother went to the police station early that evening. Michigan State Police Detective Sergeant David Rivard met them and organized a showup identification of defendant and Ramsey. At the preliminary examination, Detective Sergeant Rivard explained, "it's common that what we can do is call a show up, is to show the possible

3

suspects to—excuse me—show the possible witnesses' [sic] the possible suspects to see if in fact we are doing our investigation in the right direction." He further explained that the showup was conducted because suspects had been identified relatively quickly.

The station has three interview rooms, and the detective sergeant put defendant in one interview room and Ramsey in another. The men were alone in their respective rooms, wore their street clothes, and were unrestrained. The detective sergeant took Jones to the rooms for the purpose of making an identification. The detective sergeant testified there was nothing out of the ordinary about conducting a showup this way. Jones and the detective sergeant would later disagree about what happened next.

Jones would say that he could identify neither man as having been involved in the shooting, while the detective sergeant would say that Jones identified defendant as the shooter but did not identify Ramsey. No one witnessed the conversation between Jones and the detective sergeant, and the conversation was not recorded in any way. Jones did not sign any kind of statement or report indicating that he had made an identification.

Later, the police collected videos from nine security cameras near the crime scene, each showing a Jeep Commander. The police then edited the security videos together with the dashboard camera view of the traffic stop into one video compilation. One clip showed a Jeep Commander arriving near the crime scene. Another clip showed a Jeep Commander stopping at a house for several minutes, at least one person getting out of the Jeep and going into the house, then at least one person getting back into the Jeep, and it leaving. Each clip in the compilation showed a Jeep Commander, but none of the clips showed the shooting or the license plates of the vehicles they depicted.

4

Defendant and Ramsey were both charged with open murder, MCL 750.316; conspiracy to commit murder, MCL 750.157a; being a felon in possession of a firearm, MCL 750.224f; and having a firearm during the commission of a felony, MCL 750.227b(1). Jones was repeatedly questioned about making an identification at the preliminary examination, and every time he denied making an identification. Specifically, Jones said, "I seen the gun, I can't identify the person who was really." Defendant objected to Detective Sergeant Rivard's testimony about the showup identification and filed a motion to suppress. The circuit court issued a written opinion that implicitly acknowledged that the showup was unnecessarily suggestive, but the court nonetheless concluded that the identification was reliable:

> [T]he identification occurred within hours of the homicide, while the details of the crime were still fresh in the witness' mind. Rivard explained that the show-up procedure was used as an investigative tool to determine if their investigation was headed in the right direction. Although Defendants were singled out because they were presented alone, there is no evidence that Jones was pressured to identify either man nor was he told that the police had arrested the suspects. The fact that Jones identified Sammons as the gunman, but did not identify Ramsey, indicates that he was relying on his memory of the crime and was not influenced by the suggestiveness of the procedure. Based on the totality of the circumstances, the Court finds that the out-of-court identification was reliable and did not violate due process.

The circuit court thus denied the motion to suppress.

At trial, the prosecution offered the video compilation, as well as the testimony of Jones and Watkins. Jones acknowledged that he had taken part in the showup procedure, but he once again denied having made any identification. Detective Sergeant Rivard testified that Jones had identified defendant at the showup. Watkins testified that she saw the offenders flee in a "[g]ray, silver Jeep, whatever you call those things." She specifically

5

denied being able to estimate the age of the vehicle she saw: "I don't know the difference, new, old. I know it looked like a Jeep." She also identified a photo of the Jeep that Ramsey and defendant were stopped in as the Jeep from the scene. However, she did not identify any distinguishing features other than the color and make. She said only, "It was a box." A jury found both men guilty of the conspiracy count and acquitted them on the remaining counts.

Both men filed motions for a directed verdict or a new trial. The circuit court denied defendant's motion but granted Ramsey's, ruling that there was insufficient evidence to sustain his conviction. The Court of Appeals affirmed defendant's conviction, and he sought leave to appeal here. We ordered oral argument on the application, directing the parties to file supplemental briefs addressing whether the showup was impermissibly suggestive; if so, whether the identification was nonetheless reliable; and whether, if improperly admitted, any error was harmless. *People v Sammons*, 503 Mich 910, 910 (2018).

## II. STANDARD OF REVIEW

We review a trial court's findings of fact in a suppression hearing for clear error. *People v Hammerlund*, 504 Mich ___, ___; ___ NW2d ___ (2019). The application of law to those facts is a constitutional matter that this Court reviews de novo. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015).

## III. ANALYSIS

Due process protects criminal defendants against "the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive

6

procedures." *Moore v Illinois*, 434 US 220, 227; 98 S Ct 458; 54 L Ed 2d 424 (1977). Exclusion of evidence of an identification is required when (1) the identification procedure was suggestive, (2) the suggestive nature of the procedure was unnecessary, and (3) the identification was unreliable. *Perry v New Hampshire*, 565 US 228, 238-239; 132 S Ct 716; 181 L Ed 2d 694 (2012). See also *People v Kurylczyk*, 443 Mich 289, 302-303; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.); *id*. at 318 (BOYLE, J., concurring in part).[2]

## A. SUGGESTIVENESS

The inherently suggestive nature of showups has long been beyond debate. Showups have been called "the most grossly suggestive identification procedure now or ever used by the police." Wall, *Eye-Witness Identification in Criminal Cases* (New York: Charles C Thomas, 1965), p 28. More than 50 years ago, the United States Supreme Court observed that "[t]he practice of showing suspects singly to persons for the purpose of

---

[2] In *Kurylczyk*, almost 20 years before *Perry*, the defendant argued that a photographic lineup and a corporeal lineup each violated his due-process rights. In an opinion by Justice GRIFFIN, joined in relevant parts by Justice BOYLE, we agreed that the photographic lineup was suggestive, *Kurylczyk*, 443 Mich at 306 (opinion by GRIFFIN, J.) ("[W]e do not question his contention that his photograph stood out from the others in a suggestive fashion."), and we described the remaining inquiry as whether "under the totality of the circumstances there [was] a substantial likelihood of misidentification," *id*. at 306; see also *id*. at 318 (BOYLE, J., concurring in part). To answer that question, we considered the factors discussed in *Biggers*, 409 US at 201. *Kurylczyk*, 443 Mich at 306-308, 310-311 (opinion by GRIFFIN, J.). Although we did not separately address necessity, it does not appear to have been at issue. With respect to the corporeal lineup, we held that it was not impermissibly suggestive. *Id*. at 313-314. Consequently, there was no reason to inquire into reliability under the *Biggers* factors. Our analysis in *Kurylczyk* was not substantively different from the three-step analysis of *Perry* that we apply today. If the demarcation of the steps was less clear then than now, that could be a product of the evolution of the relevant federal caselaw. Although we think *Kurylczyk* is entirely consistent with *Perry*, obviously we would be bound to follow *Perry* to the extent these cases might be inconsistent.

identification, and not as part of a lineup, has been widely condemned." *Stovall v Denno*, 388 US 293, 302; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), abrogated in part on other grounds by *Griffith v Kentucky*, 479 US 314 (1987).  Almost 80 years ago, Professor John Henry Wigmore opined that an identification produced by a showup is "next to worthless" and that "there is no excuse for jeopardizing the fate of innocent men by such clumsy, antiquated methods . . . ."  4 Wigmore, Evidence (3d ed), § 1130, p 214 n 2.

The procedure continues to receive critical treatment.[3]  The nature of the suggestion is apparent: "when the witness is shown only one person . . . , [the witness] is tempted to presume that he is the person [police suspect]."  *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998) (quotation marks and citation omitted).  Said another way, "a one-man

---

[3] See *Young v State*, 374 P3d 395, 421 (Alas, 2016) ("Alaska courts have long restricted the use of showups as an identification procedure to where it is necessary under the circumstances."); *Commonwealth v Figueroa*, 468 Mass 204, 217; 9 NE3d 812 (2014) ("A showup identification is disfavored because it is inherently suggestive, but it violates due process only where the defendant proves by a preponderance of the evidence that it is *unnecessarily* suggestive") (quotation marks and citation omitted); Cicchini & Easton, *Reforming the Law on Show-up Identifications*, 100 J Crim L & Criminology 381, 389 (2010) ("[T]he way in which show-ups are necessarily conducted makes them incredibly suggestive."); Lee, *No Exigency, No Consent: Protecting Innocent Suspects from the Consequences of Non-exigent Show-ups*, 36 Colum Hum Rts L Rev 755, 759 (2005) ("[T]he suggestiveness of the [showup] procedure outweighs its reliability when conducted under non-exigent circumstances."); *People v Brisco*, 99 NY2d 596, 613; 788 NE2d 611; 758 NYS2d 262 (2003) (Smith, J., dissenting) ("[A] showup . . . is inherently suggestive and for that reason strongly disfavored.  That showup identifications are inherently suggestive means that they are likely to result in the identification of an innocent person as the perpetrator of a crime.  Despite their inherent suggestiveness, showup identifications are permissible if exigent circumstances require immediate identification or if the suspects are captured at or near the crime scene and can be viewed by the witness immediately.") (quotation marks and citations omitted).

showup conveys a clear message that the police suspect *this* man." *Ex parte Frazier*, 729 So 2d 253, 255 (Ala, 1998) (quotation marks and citation omitted).[4]

Additionally, if a witness makes an incorrect identification from among several choices in a lineup, errors will often be spread to "fillers,"[5] creating a harmless "known error." Wells, *Police Lineups: Data, Theory, and Policy*, 7 Psychol Pub Pol'y & L 791, 794 (2001). But in a showup, any mistaken identification will fall on the suspect. Given this, the empirical finding that innocent suspects are more often identified in showups than lineups is unsurprising. Steblay et al, *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison*, 27 Law & Hum Behav 523, 533 (2003).

The suggestiveness of a showup is aggravated when it is conducted in a police stationhouse. In holding stationhouse showups inadmissible as a matter of law, New York's highest court acknowledged this added layer of suggestion: "[u]nreliability of the most extreme kind infects showup identifications of arrested persons held at police stations . . . ." *People v Riley*, 70 NY2d 523, 529; 517 NE2d 520 (1987). See also *State v Gordon*, 185 Conn 402, 414; 441 A2d 119 (1981) ("The circumstances of the station house

---

[4] See *State v Lawson*, 352 Or 724, 783; 291 P3d 673 (2012) ("[T]he witness is always aware of who police officers have targeted as a suspect."); *United States v Brown*, 471 F3d 802, 804 (CA 7, 2006) ("[T]he single photo or one-person showup implies that the police have their man and suggests that the witness give assent."); *United States v Funches*, 84 F3d 249, 254 (CA 7, 1996) ("[P]resumably the police would not bring in someone that they did not suspect had committed the crime.").

[5] Fillers, also known as "foils," are innocent people used in police lineups.

show-up unnecessarily suggested to the victim that she should positively identify the defendant."), overruled on other grounds by *State v Artis*, 314 Conn 131 (2014).

In this case, all we need to observe in order to conclude that the procedure was suggestive is that defendant was shown singly to the witness.[6] The prosecution argues that the showup was not suggestive because defendant was wearing his street clothes and was not handcuffed or restrained. To be sure, the showup would have been more suggestive if defendant had been shackled in a striped jumpsuit, but noting other ways the showup could have been more suggestive does not help us determine whether this showup was suggestive.[7]

The prosecution argues that Detective Sergeant Rivard did not suggest either of the men was involved in a criminal investigation, but that is inaccurate. Taking the detective sergeant at his word that he did not make any sort of announcement about his suspicions, Jones could plainly see for himself that defendant and Ramsey were involved in a criminal investigation—being the subject of a showup *is* involvement in a criminal investigation.

---

[6] The prosecution argues defendant was not shown "singly" to Jones because Ramsey was present in the next room. The prosecution's attempt to characterize what happened as a two-person lineup is belied by the circumstances—police were looking for two men and they showed Jones two men. Rather than suggesting police were looking for *this man*, the circumstances suggested police were looking for *these men*. The suggestion is still clear. Even the detective sergeant who administered the procedure characterized it as a showup. This was a showup.

[7] The dissent similarly lists things the detective sergeant did or did not do during the showup in furtherance of the proposition that the procedure was not so suggestive as to require reversal. The main problem with this line of reasoning is that we do not know what the detective sergeant did or did not do because the detective sergeant failed to record the procedure.

Further, Jones testified that he understood he was taken to see defendant for the purpose of making an identification. The procedure the police used was certainly suggestive.[8]

Fair and reliable identification procedures are not something that should be controversial in Michigan's law enforcement community. Putting aside that showups were considered "antiquated" in 1940 and have been "widely condemned" since at least the 1960s, in 2015 the Prosecuting Attorneys Association of Michigan (PAAM) published best practices that advised agencies to provide clear written policies on conducting identifications and to provide training to officers on minimizing contamination. Prosecuting Attorneys Association of Michigan, *Best Practices Recommendation: Eyewitness Identification and Procedures*, available at <https://www.michiganprosecutor.org/files/PAAM_Best_Practices_Eyewitness_Identific

---

[8] After acknowledging this showup was suggestive, the dissent goes on to argue that "it could appear to Jones that Ramsey and defendant were also present at the police station for innocent reasons." We do not need to imagine what Jones might have thought was going on when the detective sergeant walked him down the hall, because Jones told us what he was thinking. Jones testified that he believed he was being asked to make an identification:

> *Q*: During the course of the time that you were at the City of Saginaw Police Department, were you walked down a hallway?
>
> *A*: Yes sir.
>
> *Q*: Purpose of identifying anybody?
>
> *A*: Yes sir.

Given that Jones understood he was being asked to identify defendant and Ramsey as participants in the shooting, it could not have appeared to Jones that defendant and Ramsey were at the police station for innocent reasons unless Jones thought the detective sergeant was asking him to identify random people at the station as participants in the crime. Jones never testified to that, and we decline to entertain that possibility.

ation.pdf> (accessed February 14, 2020) [https://perma.cc/5LM4-BJLQ]. Although PAAM discussed photo arrays and lineups, it did not advise agencies to conduct showups. *Id*. PAAM recommended that identifications be conducted by an officer who is not aware of who the suspect is to avoid unintentional contamination.[9] *Id*. PAAM further recommended giving standardized instructions to witnesses and documenting the entire procedure, including the witness's level of confidence in the identification. *Id*. These best practices were not employed in this case.

Even earlier, in 1999, the United States Department of Justice (DOJ) offered similar advice. United States Department of Justice, *Eyewitness Evidence: A Guide for Law Enforcement*, available at <https://www.ncjrs.gov/pdffiles1/nij/178240.pdf> (accessed February 14, 2020) [https://perma.cc/8EUR-L28V]. The DOJ advised that because there was "inherent suggestiveness" in a showup, the procedure should only be used "[w]hen circumstances require," and in that event the suggestiveness should be minimized with the use of procedural safeguards. *Id*. at 27. Like the PAAM best practices, the DOJ-suggested safeguards were not used here. The showup was suggestive, without any procedures used to mitigate its suggestiveness.

---

[9] Blind administration of identification procedures avoids subtle and even unintentional suggestion through "tone of voice, pauses, demeanor, facial expressions, and body language," which may be "difficult to detect and prevent." *Lawson*, 352 Or at 779, citing Haw & Fisher, *Effects of Administrator-Witness Contact on Eyewitness Identification Accuracy*, 89 J Applied Psychol 1106, 1110 (2004). The administrator cannot unintentionally suggest whom police suspect if he or she does not know. Of course, blind administration of a showup is of little value as the procedure itself leaves no doubt whom police suspect.

## B. NECESSITY

None of this is to say that the police may never conduct a showup, despite its suggestiveness. Having concluded that the identification procedure was suggestive, we next ask whether the suggestiveness of the procedure was necessary.[10] There are instances in which a fair and nonsuggestive procedure simply is not possible. For example, in *Stovall* the only witness to a murder had been stabbed 11 times and was in the hospital awaiting a major surgery needed to save her life. *Stovall*, 388 US at 295. The police brought their suspect to the hospital where he was shown singly to the witness. *Id*. However, she was the only witness who could confirm or deny the suspect's involvement and "[n]o one knew how long [the witness] might live." *Id*. at 302 (quotation marks and citation omitted). The circumstances of that case made the showup necessary, and those circumstances certainly do not present the only situation in which a showup might be necessary.

But we do not need to explore the boundaries of what amounts to necessity or adopt any specific rule to see that the showup here was *not* necessary. The prosecution argues that the showup was necessary because it occurred relatively soon after the crime, the

---

[10] The trial court declined to address suggestiveness or necessity and moved straight to the reliability portion of the analysis. The Court of Appeals conflated the ideas of suggestiveness and necessity, failing to really grapple with either. *People v Sammons*, unpublished per curiam opinion of the Court of Appeals, issued July 6, 2017 (Docket No. 332190), p 3. The Court of Appeals acknowledged that defendant was shown singly to Jones, although it ignored the setting of the showup in the police stationhouse. *Id*. Then, after noting ways in which the procedure was not suggestive, the Court of Appeals concluded, "to the extent that defendant's appearing in a room alone was suggestive, there is no indication that comments or actions by the police rendered the identification procedure unnecessarily suggestive." *Id*. at 3-4. With regard to suggestiveness, as explained earlier, noting ways in which a procedure could have been more suggestive does not address the ways it was suggestive. With regard to necessity, the Court of Appeals did not engage in any analysis.

13

investigation was moving quickly, and police were trying to determine whether the investigation was headed "in the right direction." We disagree. Defendant and Ramsey were arrested minutes after the shooting, and Jones did not arrive at the police station until 4 to 5 hours later. Further, there is nothing in the record to indicate that the police could not have taken more time if necessary to set up a corporeal or photographic lineup since defendant and Ramsey were in custody. The crime had been long over by the time the showup was conducted, and there was no ongoing danger that police were better able to address by dispensing with a reliable identification procedure. There was no necessity justifying the showup procedure here.[11]

## C. RELIABILITY

Even though the identification procedure was unnecessarily suggestive, the evidence it produced could still be admissible unless the improper police conduct created

---

[11] The procedures and safeguards discussed by PAAM and the DOJ are, in those organizations' opinions, the best practices for obtaining the most accurate and reliable evidence from eyewitnesses. The introductory message to the DOJ's guide explains: "[I]t is absolutely essential that eyewitness evidence be accurate and reliable. One way of ensuring we, as investigators, obtain the most accurate and reliable evidence from eyewitnesses is to follow sound protocols in our investigations." *Eyewitness Evidence: A Guide for Law Enforcement*, at iii. Indeed, as one commentator has astutely pointed out, unnecessarily suggestive identification procedures "do not further any valid law enforcement interest." Rosenburg, *Rethinking the Right to Due Process in Connection With Pretrial Identification Procedures: An Analysis and a Proposal*, 79 Ky L J 259, 291 (1990). Rather, "an unnecessarily suggestive identification procedure simply creates unreliable evidence where reliable evidence could have been gathered. It is not a case where good ends justify bad means—the end result of an unnecessarily suggestive procedure is worthless precisely because of the means used." *Id*. In his haste, the detective sergeant did not just jeopardize the fate of a potentially innocent man, he also might have compromised his investigation and tainted the testimony that could have proved to be the prosecution's best evidence. Not only was conducting a showup unnecessary, it was counterproductive to efforts to obtain the most accurate and reliable evidence.

14

a "substantial likelihood of misidentification."[12]  *Biggers*, 409 US at 201; *Perry*, 565 US

at 239 (quoting *Biggers*); *People v Thomas*, 501 Mich 913, 913 (2017).  A per se rule of

automatic exclusion of unnecessarily suggestive identification procedures was rejected by

the United States Supreme Court in favor of a "totality of the circumstances" approach

aimed at balancing three factors: preventing unreliable eyewitness testimony from getting

to a jury, deterring the police from conducting unnecessarily suggestive procedures, and

the effect on the administration of justice.  *Manson v Brathwaite*, 432 US 98, 112-113; 97

S Ct 2243; 53 L Ed 2d 140 (1977).[13]

---

[12] The dissent acknowledges that the showup was suggestive and unnecessary, but concludes that the showup should be admissible nonetheless because it retains strong indicia of reliability under the *Biggers* factors as weighed against the extent of its suggestiveness.  We not only disagree about the extent of the suggestiveness of the showup, we also disagree with the dissent's application of the *Biggers* factors.

[13] The Court observed that a per se rule would go too far in the first regard by excluding testimony that is reliable notwithstanding its having been obtained through an unnecessarily suggestive procedure.  *Manson*, 432 US at 112.  While the police would surely be deterred by a per se rule of exclusion, the Court opined that "[t]he police will guard against unnecessarily suggestive procedures under the totality rule, as well as the *per se* one, for fear that their actions will lead to the exclusion of identifications as unreliable." *Id*.  The Court was most concerned with the administration of justice in that if the trier of fact was denied "reliable evidence" by a per se rule of exclusion, then "it may result, on occasion, in the guilty going free." *Id*.  Conversely, if these incentives do not operate on actors in the criminal justice system as the *Manson* Court predicted, the result may be conviction of the innocent.  Other states have interpreted their state protections differently than the federal protection in this regard.  See *State v Harris*, 330 Conn 91, 115; 191 A3d 119 (2018) (holding that the *Biggers* factors do not provide a sufficient measure for reliability and that state due-process protections require a different reliability analysis); *Young*, 374 P3d at 426-427 (holding that the *Biggers* factors do not provide a sufficient measure for reliability and that state due-process protections require a different reliability analysis); *Lawson*, 352 Or at 739-751 (refining an existing parallel state reliability analysis based on scientific and legal developments); *State v Henderson*, 208 NJ 208, 285; 27 A3d 872 (2011) (holding that the *Biggers* factors do not provide a sufficient measure for reliability, do not deter improper police conduct, and overstate the jury's innate ability to

We apply the nonexclusive list of factors set out in *Biggers* to determine whether an unnecessarily suggestive identification is reliable. *Kurylczyk*, 443 Mich at 306 (opinion by GRIFFIN, J.); *id*. at 318 (BOYLE, J., concurring in part). The factors are (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of his prior description of the criminal," (4) "the level of certainty demonstrated at the confrontation," and (5) "the time between the crime and the confrontation." *Manson*, 432 US at 114 (applying the *Biggers* factors to determine reliability of a witness identification). In *Perry*, the Court framed the inquiry as follows:

> An identification infected by improper police influence . . . is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.[14]

evaluate eyewitness testimony and that state due-process protections require a different reliability analysis); *People v Adams*, 53 NY2d 241, 250-252; 423 NE2d 379 (2005) (holding that the state's due-process requirements require per se exclusion of unnecessarily suggestive showups); *Commonwealth v Johnson*, 420 Mass 458, 465; 650 NE2d 1257 (1995) (holding that the state's due process requirements require per se exclusion of unnecessarily suggestive showups). We have not been asked to reach that question in this case.

[14] *Perry*, 565 US at 232, quoting *Simmons*, 390 US at 384. With respect to the burden of proof, in *Kurylczyk*, we held that "In order to sustain a due process challenge, a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *Id*. at 302 (opinion by GRIFFIN, J.), citing *Biggers*, 409 US at 196. However, while "[t]he defendant has the initial burden of proving that the identification procedure was unnecessarily suggestive," when addressing the *Biggers* factors, the prosecutor bears the burden of proof. *State v Perri*, 164 NH 400, 404; 58 A3d 627 (2012). See also *English v Cody,* 241 F3d

Starting with the first *Biggers* factor, Jones's opportunity to view the criminal at the time of the crime was, on balance, poor. While the circumstances of *Biggers* are not a threshold or litmus test for weighing this factor in favor of a finding of reliability, they are a useful reference point for comparison purposes. In *Biggers*, the witness was the victim of a violent sexual assault. *Biggers*, 409 US at 193-194. There, in addition to viewing the defendant in adequate lighting, the witness was forced to face the defendant "directly and intimately" and was "no casual observer." *Id*. at 200. She was with her assailant for between 15 and 30 minutes. *Id*. at 194. By contrast, Jones was in the backseat of a moving vehicle and the shooting took place across the street on the opposite side of the car, some 20 to 25 feet away. Jones's mother sped away upon hearing the shots, only to return when the suspects were gone. Jones had less than a minute to view the scene and only a glancing viewing opportunity. Although the crime occurred in daylight, Jones testified, "I couldn't get a good look." Unlike the victim in *Biggers*, Jones did not view the defendant "directly and intimately" for an extended period of time. *Id*. at 200. Instead, he was a "casual

---

1279, 1282-1283 (CA 10, 2001) ("It is only after the defendant meets this burden [of showing that an identification procedure is unnecessarily suggestive] that the burden shifts to the government to prove that the identification was reliable independent of the suggestive procedure."). This makes sense given that, as noted, "the trial judge must screen the evidence for reliability pretrial" in order to determine whether "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances . . . ." *Perry*, 565 US at 232.

17

observer." *Id*. Jones's limited opportunity to view the defendant at the time of the crime does not provide strong indicia of reliability.[15]

Regarding the second *Biggers* factor, Jones's attention was drawn to the shooting, but Jones does not appear to have focused on the physical features of the shooter. In *Biggers*, the witness faced her assailant "directly and intimately" and was a "victim of one of the most personally humiliating of all crimes." *Id*. In this case, to the extent that Jones was focused on the scene, his testimony indicates that he was looking at the Jeep, the driver of the Jeep, and the gun rather than at the shooter. Jones testified his attention was drawn by the gun: "I seen [sic] the gun, I can't identify the person who was really." Given that the witness himself testified he "wasn't paying attention" to the physical features of the person he was asked to identify, we do not believe that his degree of attention provides strong indicia of reliability.[16]

The description Jones gave before viewing defendant and Ramsey matched them in a general sense. In *Biggers*, the witness's description included specific details of

[15] The dissent argues that Jones had adequate opportunity to view the crime based on events he was able to recount and his agreement that he "had a pretty good . . . view of what was going on." We agree Jones seemed to be able to see the events of the shooting *generally*, and the dissent's discussion demonstrates that much. But Jones was not able to correctly list distinguishing features of the shooter or driver, and by Jones's own account with regard to identifying the perpetrators, he "couldn't get a good look." Jones's view of the assailant is the pertinent inquiry, and that view was poor.

[16] The dissent acknowledges Jones's own claims of inattention but would leave the matter to the jury. This approach fails to account for the fact that the reliability of an identification is a threshold determination to submitting the identification to a jury. See *Moore*, 434 US at 227; *Perry*, 565 US at 239. When the question that the *Biggers* analysis is meant to answer is whether an identification can go to a jury, it seems less than helpful to leave that analysis to the jury.

"approximate age, height, weight, complexion, skin texture, build, and voice . . . ." *Id*. Here, Jones described the pair as black men wearing white shirts driving a Jeep, and those generalities matched defendant and Ramsey. But the most specific corroborating details he gave did not match. Both defendant and Ramsey were the correct build to match the 150-pound estimation Jones gave of both offenders, but neither matched the description of the 320-pound driver given by Jones. Neither defendant nor Ramsey was bald as Jones described, and neither man had a "long beard" as Jones described the driver. Jones also remembered a partial license plate number as including "CE" or "GE," but the Jeep defendant and Ramsey were driving had the license plate number "DFQ 9593." Jones offered no other specifics. A general characteristic such as gender or skin tone will, by definition, match many people. So too with general characteristics of automobiles. Jones's description was wrong about the most specific details of the suspects, and therefore this factor does not provide strong indicia of reliability.[17]

The level of certainty of the witness at the confrontation is difficult to evaluate because it was not documented. In *Biggers*, the witness testified, "when I first laid eyes on

---

[17] The dissent criticizes our analysis of the accuracy of Jones's description for focusing too heavily on the aspects of the description Jones got wrong. However, our analysis does not focus on wrong over right, but on specific over general. The third *Biggers* factor "helps the court determine if and when the witness developed and expressed a concrete and specific impression of the individual's characteristics firm enough to remain reliable despite the vagaries of time and the pressures of any undue suggestiveness." *United States ex rel Kosik v Napoli*, 814 F2d 1151, 1159 (CA 7, 1987). The more specific the characteristic, the more relevance it has as to the accuracy of the description. We acknowledge the most general aspects of Jones's description matched defendant. But that general description might have also matched hundreds or thousands of others. The specific characteristics offered by Jones tell us whether his description was accurate, and those did not match.

him, I knew that it was the individual, because his face—well, there was just something that I don't think I could ever forget." *Id*. at 195-196. In this case, Jones denies even making an identification. The detective sergeant testified that Jones identified defendant, but the detective sergeant provided no information about Jones's level of certainty at the confrontation. Since Jones denies even making the identification and, at any rate, the prosecutor does not even claim Jones had a high level of certainty, it is hard to see how this could be a strong, or for that matter any, indication of reliability.[18]

The time between the crime and confrontation, here 4 or 5 hours, is clearly much shorter than the span of 7 months in *Biggers*. *Id*. at 201. This is the sole *Biggers* factor relied on by the trial court: "the details of the crime were still fresh in the witness' mind." This factor provides some indicia of reliability.

Lastly, the trial court reasoned, "[t]he fact that Jones identified [defendant] as the gunman, but did not identify Ramsey, indicates that he was relying on his memory of the crime and was not influenced by the suggestiveness of the procedure." We disagree. That the defendant did not identify both suspects does not necessarily mean that he was not influenced by the procedure. And that he only identified one of the two men whom the police believed were involved in the crime could equally support the opposite conclusion,

---

[18] The dissent is incorrect that there is "no evidence" which with to evaluate the fourth *Biggers* factor. It is true that the detective sergeant did not make a specific claim regarding Jones's level of certainty. But Jones was also present, and he denies making an identification at all. Jones's account is relevant evidence that the dissent does not address. Instead, the dissent alludes to a police report that the prosecution attempted to use to refresh Jones's recollection. The dissent also argues that this report is documentation of the identification procedure. However, the trial transcript gives us no clue as to what the report says, and the report itself was not entered into evidence.

i.e., that he did not have a good vantage point and was not paying close attention. Thus, absent some indication that Jones got a better look at the gunman's face, his inability to identify the driver does not make his identification of defendant as the gunman more reliable. We do not believe that Jones's failure to identify Ramsey provides strong indicia of reliability.

Having reviewed the *Biggers* factors and other evidence relied on by the trial court, we do not believe that the prosecution has met its burden to show that the indicia of reliability in this case "are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances . . . ." *Perry*, 565 US at 232.

### D. HARMLESSNESS

Finally, having concluded that the showup was unnecessarily suggestive and unreliable, we must determine whether the error of its admission was harmless. As noted, introduction of a tainted identification violates the constitutional guarantee of due process. *Moore*, 434 US at 227. The error was preserved with the objection to Detective Sergeant Rivard's testimony. This Court reviews preserved constitutional errors to determine whether the beneficiary of the error has established that the error was harmless beyond a reasonable doubt. *Kurylczyk*, 443 Mich at 315-316 (opinion by GRIFFIN, J.); *id.* at 318 (BOYLE, J., concurring in part); *People v Anderson (After Remand)*, 446 Mich 392, 406; 521 NW2d 538 (1994); *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999). When evaluating whether erroneously admitted evidence was harmless beyond a reasonable doubt, we must "determine the probable effect of that testimony on the minds of an average jury." *Kurylczyk*, 443 Mich at 315 (opinion by GRIFFIN, J.) (quotation marks

21

and citations omitted); see also *id*. at 318 (BOYLE, J., concurring in part).  Reversal is required if the average jury "would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony." *Id*. (quotation marks and citation omitted).  The prosecution cannot show that the error in this case was harmless beyond a reasonable doubt.

The prosecution argues that the admission of the showup was harmless because the identification's unreliability was exposed to the jury through cross-examination and because the jury was instructed to evaluate the reliability of the identification.  Said another way, the showup had so little value it could not have affected the jury's verdict.  When an appellate court is considering harmlessness, it will always be the case that the identification was unreliable.  Further, it should always be the case that defense counsel explored reliability through cross-examination and the jury was instructed to evaluate the reliability of the identification.  The prosecutor's position sweeps too broadly—it would render every error of this kind harmless.

Courts have widely acknowledged that juries place disproportionate weight on eyewitness identifications, even if they lack indicia of reliability.[19]  While the showup had

---

[19] See *Garner v People*, 436 P3d 1107, 1107; 2019 CO 19 (Colo, 2019) ("Precisely because identification testimony is so persuasive, a mistaken identification can lead to a wrongful conviction."); *State v Jackson*, 248 So 3d 1279, 1283; 2016-1100 (La 5/1/18) ("Scholars and judges alike have commented that the inherent risk of misidentification is generally exacerbated by the compelling nature of eyewitness testimony . . . ."); *State v Artis*, 314 Conn 131, 155; 101 A3d 915 (2014) ("We acknowledge the powerful effect that eyewitness identification testimony has on juries and recognize that the improper admission of that evidence will constitute harmful error in many instances, particularly when there is no other such eyewitness identification testimony."); *State v Delgado*, 188 NJ 48, 60; 902 A2d 888 (2006) ("Eyewitness identification can be the most powerful evidence presented at trial, but it can be the most dangerous too.").

little actual probative value, the "probable effect of that testimony on the minds of an average jury," *Kurylczyk*, 443 Mich at 315 (opinion by GRIFFIN, J.) (quotation marks and citations omitted); *id*. at 318 (BOYLE, J., concurring in part), was almost certainly disproportionately large. If we were to consider only the weight of the showup as the prosecution suggests, we would find it harmful.[20]

But, as with *Kurylczyk*, we must determine whether the prosecution's case was "significantly less persuasive" without the showup. This requires us to consider the remainder of the prosecution's case. Without the showup, the prosecution's only evidence was the security camera compilation and Watkins's identification of the Jeep.

The compilation is far from conclusive. While a Jeep passes by in each clip, there are no identifiable distinguishing features. The compilation might depict the same Jeep in each of the clips, or it might not. The compilation might depict the Jeep from the crime, or it might not. The last clip depicts the traffic stop of the Jeep defendant and Ramsey were traveling in, but earlier clips might or might not. There simply is no way to know. Even if the compilation did trace one vehicle from the crime to the traffic stop, it also shows that,

---

[20] The dissent criticizes us for lacking faith in our jury system and notes that in *Manson* the United States Supreme Court was "content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." *Manson*, 432 US at 116. The dissent seems to have failed to consider the sentence preceding that quotation: "Surely, we cannot say that under all the circumstances of this case there is a very substantial likelihood of irreparable misidentification." *Id*. (quotation marks and citation omitted). We agree that when an identification is sufficiently reliable, its weight is to be assessed by a jury. For reasons discussed at length here, we continue to think unreliable identifications should not be presented to juries. See *Moore*, 434 US at 227 ("[D]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.").

after the shooting, at least one person got out, and at least one person got in. There is no way to determine whether the person or people who got out of the Jeep are the same as the one or ones who got in. Watkins's identification of the Jeep via a photograph is also far from conclusive. The color and make were the only features of the Jeep she seemed aware of. She failed to identify any other aspect about the Jeep that was familiar to her: "I don't know the difference, new, old. I know it looked like a Jeep. . . . It was a box." And it is worth again noting that the license plate on the Jeep defendant was in when he was arrested did not contain any of the letter combinations that Jones reported to police. Without the showup, this is the sum of the prosecution's case. We have little trouble concluding that it is "significantly less persuasive" without the showup.

Our conclusion is buttressed by the fact that the trial court also found the prosecution's case "significantly less persuasive" without the showup. As noted earlier, the trial court denied a directed verdict to defendant, but it granted a directed verdict to Ramsey.[21] In denying the directed verdict to defendant, the court reasoned that "[t]he out-of-court identification testimony of Sergeant Rivard by itself, and together with the other circumstantial evidence presented," was sufficient to sustain the verdict. But the only difference between the evidence against defendant and Ramsey was the showup. We

---

[21] That decision was reversed in the Court of Appeals; Ramsey's application for leave to appeal the Court of Appeals decision is still pending. See *People v Ramsey (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued July 2, 2019 (Docket No. 334614), application for leave to appeal pending. But the resolution of the legal issues in that case does not affect our observation that at least for the trial court, which observed the prosecution's case in person, the decision to grant or deny a directed verdict turned on the showup identification.

believe the prosecution's case was "significantly less persuasive" without the showup identification evidence.

## IV. CONCLUSION

We conclude that the showup conducted by the police was unnecessarily suggestive and unreliable. Further, the error was not harmless. Accordingly, we reverse the Court of Appeals judgment, suppress any evidence from the showup, and remand to the Saginaw Circuit Court for a new trial.

Megan K. Cavanagh
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement

25

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                                No. 156189

TRAVIS TRAVON SAMMONS,

     Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

I respectfully dissent. On a sunny June afternoon, 16-year-old Dyjuan Jones witnessed the murder of Humberto Casas from approximately 20 to 25 feet away while riding in the back of his mother's vehicle. Specifically, Jones observed a passenger exit a light gray Jeep and fire multiple shots at Casas. Jones did not have a clear view of the driver, who remained in the Jeep throughout the incident. But Jones had a clear, unobstructed view of the shooter. At the scene, Jones provided police with a description of the driver, the passenger-shooter, and the vehicle in which they fled after the shooting. This information proved invaluable. Shortly after the shooting, police stopped a vehicle matching the description provided by Jones. The vehicle had two occupants: Dominique Ramsey, the driver, and defendant, the front seat passenger. The description of the shooter provided by Jones matched defendant. Defendant and Ramsey were taken to the Saginaw Police Department. Approximately four or five hours after the murder, Jones went to the Saginaw Police Department to be interviewed regarding the crime. During a break in the interview, Michigan State Police Detective Sergeant David Rivard asked Jones to walk

down a hallway and look into two interview rooms located at the end of the hall. Detective Sergeant Rivard asked Jones to determine whether he knew anyone seated in either room, and if so, how he knew them. Jones did just that and upon returning identified defendant, who was seated in one of the rooms, as the shooter. Jones did not identify Ramsey, who was seated in the other interview room. At the preliminary examination and later at trial, however, Jones testified that he never identified defendant as being involved in the crime. The identification of defendant by Jones was nonetheless admitted into evidence through the testimony of Detective Sergeant Rivard pursuant to MRE 801(d)(1)(C) (prior statement of identification). The jury, tasked with the duty of determining the veracity and credibility of both Jones and Detective Sergeant Rivard as well as assessing the reliability, if any, of the identification of defendant allegedly made by Jones, found defendant guilty of conspiracy to commit open murder.

I do not take issue with the majority opinion's conclusion that the identification procedure employed at the police station was suggestive and unnecessary. Nonetheless, I do not believe this procedure was so unduly suggestive as to lead to a substantial likelihood of misidentification. Viewed under the totality of the circumstances and weighed against the corrupting effect of the suggestiveness of this procedure, I conclude that the identification of defendant by Jones retained strong indicia of reliability. I therefore see no clear error in the trial court's decision to admit evidence that Jones identified defendant as the shooter. I would affirm the trial court and the Court of Appeals.

2

## I. STANDARD OF REVIEW

A "trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous."[1]  "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made."[2]

## II. LEGAL BACKGROUND

The majority opinion has condemned the pretrial identification procedure used in this case as an impermissible showup.[3]  I do not contest that identifications made by way of a showup are disfavored.[4]  Nonetheless, the Supreme Court of the United States has made it clear that suppression of evidence is not required merely because the identification of an alleged assailant was obtained through a showup.[5]  The Supreme Court has stated

---

[1] *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.). Justice GRIFFIN's opinion was joined, in all the parts relevant to this case, by Justice BOYLE.  See *id*. at 318 (BOYLE, J., concurring in part).  For ease of reading, citations to this concurrence are not included, but may be assumed throughout this opinion.

[2] *Id*. at 303 (opinion by GRIFFIN, J.).

[3] A "showup" is defined as "[a] police procedure in which a suspect is shown singly to a witness for identification . . . ." *Black's Law Dictionary* (11th ed).  There are volumes of cases that expound on the suggestiveness of showups.  The procedure implemented by Detective Sergeant Rivard was indeed suggestive.  But suggestiveness alone does not require suppression.  In the end, " 'each case must be considered on its own facts . . . .' " *Neil v Biggers*, 409 US 188, 196; 93 S Ct 375; 34 L Ed 2d 401 (1972), quoting *Simmons v United States*, 390 US 377, 384; 88 S Ct 967; 19 L Ed 2d 1247 (1968).

[4] *Stovall v Denno*, 388 US 293, 302; 87 S Ct 1967; 18 L Ed 2d 1199 (1967) (explaining that showups have been "widely condemned"); see also *United States v Brownlee*, 454 F3d 131, 138 (CA 3, 2006) ("[A] show-up procedure is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime.").

[5] *Perry v New Hampshire*, 565 US 228, 239; 132 S Ct 716; 181 L Ed 2d 694 (2012) ("Even when the police use [an unnecessarily suggestive identification] procedure, . . . suppression of the resulting identification is not the inevitable consequence.").

that a rule requiring the automatic exclusion of showups "would 'go too far,' for it would 'keep evidence from the jury that is reliable and relevant,' and 'may result, on occasion, in the guilty going free.' "[6] Indeed, it is well established that suppression of an eyewitness identification is a high bar to attain, requiring a defendant to show that "the pretrial identification procedure was *so* suggestive in light of the totality of the circumstances that it led to a *substantial* likelihood of misidentification."[7]

"[A]n unnecessarily suggestive identification may be admitted if it is sufficiently reliable."[8]   Reliability of an eyewitness identification has been characterized as the " 'linchpin' " in determining whether the identification is admissible.[9]  In *Neil v Biggers*, the Supreme Court of the United States provided a nonexhaustive list of factors to be considered in determining whether the identification was reliable, including:

> the opportunity of the witness to view the criminal at the time of the crime,
> the witness' degree of attention, the accuracy of the witness' prior description

---

[6] *Id*., quoting *Manson v Brathwaite*, 432 US 98, 112; 97 S Ct 2243; 53 L Ed 2d 140 (1977) (brackets omitted).

[7] *Kurylczyk*, 443 Mich at 302 (opinion by GRIFFIN, J.) (emphasis added), citing *Biggers*, 409 US at 196; see also *Perry*, 565 US at 261-262 (Sotomayor, J., dissenting) ("It bears reminding . . . that we set a high bar for suppression.  The vast majority of eyewitnesses proceed to testify before a jury.").

[8] *People v Thomas*, 501 Mich 913, 913 (2017), citing *Perry*, 565 US at 238-239 (opinion of the Court); see also *Manson*, 432 US at 106 ("The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability.").

[9] *Perry*, 565 US at 239, quoting *Manson*, 432 US at 114; see also *Biggers*, 409 US at 199 ("[T]he central question [is] whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.") (quotation marks omitted), and *Thomas*, 501 Mich at 913 ("[R]eliability is the ultimate touchstone for admissibility of an identification.").

of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[10]

In *Perry v New Hampshire*, the Supreme Court summarized the standard for excluding an eyewitness identification due to the lack of reliability:

> An identification infected by improper police influence . . . is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.[11]

Thus, the ultimate determination of whether an eyewitness identification is admissible is a two-step interconnected inquiry.[12] That is, courts must weigh the factors inherent to reliability, i.e., the *Biggers* factors, against "the corrupting effect of the suggestive identification itself."[13]

---

[10] *Biggers*, 409 US at 199-200.

[11] *Perry*, 565 US at 232, quoting *Simmons*, 390 US at 384; see also *People v Gray*, 457 Mich 107, 122 n 18; 577 NW2d 92 (1998) (" '[A] defendant is denied due process only when the identification evidence is so unreliable that its introduction renders a trial unfair. As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification.' "), quoting *United States v Causey*, 834 F2d 1277, 1285 (CA 6, 1987).

[12] *Howard v Bouchard*, 405 F3d 459, 469 (CA 6, 2005) ("We thus first assess whether the identification was unnecessarily suggestive, then assess whether the identification was nonetheless reliable. If an identification is reliable, it will be admissible even if the confrontation was suggestive."), citing *Manson*, 432 US at 114.

[13] *Manson*, 432 US at 114.

## III. DISCUSSION

## A. THE SHOWUP WAS NOT UNDULY SUGGESTIVE

I do not take issue with the majority opinion's conclusion that the police station showup conducted in this case was suggestive and unnecessary. But the inquiry does not end there. The identification should not be suppressed unless the showup was so *unduly* suggestive that it led to a substantial likelihood of misidentification.[14] To this end, I conclude the majority opinion fails to weigh each of the *Biggers* factors under the circumstances presented in this case and against "the corrupting effect of the suggestive identification itself."[15] For instance, defendant and Ramsey appeared before Jones in separate interview rooms and in street clothes. Both Ramsey and defendant sat unrestrained and unaccompanied by any law enforcement officers.[16] For all intents and purposes, there was nothing to suggest to Jones or any objective observer that Ramsey and defendant were suspects in any crime, let alone the crime Jones was at the police station to discuss. Jones was present at the police station to aid law enforcement. From the objective

---

[14] See *Kurylczyk*, 443 Mich at 306 (opinion by GRIFFIN, J.) ("[A] suggestive lineup is improper only if under the totality of the circumstances there is a substantial likelihood of misidentification. The relevant inquiry, therefore, is not whether the lineup photograph was suggestive, but whether it was unduly suggestive in light of all of the circumstances surrounding the identification.") (citation omitted).

[15] *Manson*, 432 US at 113, citing *Biggers*, 409 US at 199-200.

[16] But see *Brownlee*, 454 F3d at 138 (finding the showup to be unnecessarily suggestive, but still sufficiently reliable, where the defendant was shown to witnesses handcuffed, in the back of a police cruiser, with police officers nearby, at the scene of the accident where one witness observed the defendant wreck the stolen vehicle, and while "all four eyewitnesses were allowed to make identifications while exposed to the suggestive influences of others").

facts, it could appear to Jones that Ramsey and defendant were also present at the police station for innocent reasons.[17]

Further, Detective Sergeant Rivard did not tell Jones that defendant and Ramsey were suspects in the shooting, nor did Detective Sergeant Rivard ask Jones leading questions in an attempt to have Jones identify defendant and Ramsey as the assailants.[18] Detective Sergeant Rivard simply asked Jones whether he knew either of the two men

---

[17] The majority opinion states that at the preliminary examination, "Jones testified that he understood he was taken to see defendant for the purpose of making an identification." *Ante* at 11. But Jones did not say that he walked to the interview rooms "for the purpose of making an identification." He merely agreed *at the preliminary examination* with the prosecutor, likely in retrospect, that this was the prosecutor's purpose at the time of the police station showup. Further, the identification is not tainted because Detective Sergeant Rivard did not record the identification procedure. Both Jones and Detective Sergeant Rivard testified in detail regarding the facts leading to the identification of defendant by Jones. Specifically, Jones testified that Detective Sergeant Rivard "[t]old me to walk down the hallway, look left and right, it was two rooms, two males was [sic] sitting in a room, one was kind of like really clean balled [sic] and then the other one he had braids." Then in response to the question "did that Officer tell you [to] identify anybody," Jones flatly testified that "[h]e told me go down the hallway look left and right and see if I see anyone in the room." Detective Sergeant Rivard testified that he asked Jones "if he'd walk down the hallway and look into both rooms and then return back to [inform Rivard whether Jones had] . . . identified any of [the] individuals in the room, [and] if he could explain how he . . . knew them." Given the corroboration of their testimony, it is clear that Jones was not escorted to the interview rooms by police, nor was he surrounded by police when he observed defendant.

[18] See, e.g., *Thomas*, 501 Mich at 913 ("[T]he police officer's presentation of a single photograph to the victim accompanied by the question 'was this the guy who shot you?' was highly suggestive"); *Gray*, 457 Mich at 111-112 (finding the pretrial identification procedure to be highly suggestive where the "defendant was singled out by showing only one photo to the victim, and then the victim was *reassured* that defendant was her assailant because of the *statement by a police officer* that this was the man the police believed was her assailant") (emphasis added); *Howard*, 405 F3d at 470 ("[T]here is no evidence that law enforcement officers said anything to suggest to [the witness] that [the defendant] was the killer.").

7

seated in the two separate interview rooms. Detective Sergeant Rivard did not pressure or coerce Jones to make an identification, nor did he in any way suggest to Jones that an identification was at all required.[19] In fact, Detective Sergeant Rivard did nothing to suggest that the suspects from the shooting were apprehended and that an immediate identification was needed from Jones. The identification occurred during a break in the interview of Jones at the police station, not before the interview was conducted, demonstrating that an identification was not at all urgent. Moreover, that Jones identified defendant, but not Ramsey, demonstrates that Jones relied on his memory rather than any potential corrupting effect of the showup.

The majority opinion dismisses these facts altogether, stating that "noting other ways the showup could have been more suggestive does not help us determine whether this showup was suggestive."[20] The majority opinion misses the point, failing to acknowledge that these are facts properly considered under the "totality of the circumstances" analysis; facts that are pertinent to the ultimate inquiry of whether the identification by Jones was sufficiently reliable to overcome its overall suggestiveness.[21]

---

[19] See *Manson*, 432 US at 116 (finding that there was little pressure or urgency placed on the witness to make an identification, thus demonstrating that the "identification was made in circumstances allowing care and reflection").

[20] *Ante* at 10.

[21] This is not a case where the showup was so suggestive that it "made it all but inevitable that [the witness] would identify [the defendant] whether or not he was in fact 'the man.' " *Foster v California*, 394 US 440, 443; 89 S Ct 1127; 22 L Ed 2d 402 (1969). In *Foster*, the witness failed to identify the defendant despite a suggestive three-man lineup where the defendant was the tallest person by 6 inches and was the only one wearing a leather jacket similar to the one worn by the robbery suspect. *Id*. at 441. Police then arranged a one-on-one showup, where the witness still could only make a tentative identification. *Id*. Finally,

B. THE IDENTIFICATION OF DEFENDANT BY JONES WAS RELIABLE

Next we must determine whether the identification of defendant by Jones was sufficiently reliable to outweigh the suggestiveness of the showup.[22] This inquiry is resolved by looking to *Biggers* and its progeny. As an initial matter, the majority opinion fails to account for or consider the many cases decided since *Biggers*. While *Biggers* is the watershed case discussing the reliability of out-of-court identifications, there have been many cases since *Biggers* was decided in 1972 that have found identifications sufficiently reliable under circumstances that are seemingly less reliable than the circumstances present in *Biggers*.[23] The majority opinion relies too heavily on a factual comparison of this case to *Biggers* rather than an exhaustive application of the *Biggers* factors in the context of the caselaw that has developed over the past 48 years.

---

in a five-man lineup a week later, the witness affirmatively identified the defendant, who was the only person to appear in both lineups. *Id*. at 441-442. The Supreme Court found that this "procedure so undermined the reliability of the eyewitness identification as to violate due process." *Id*. at 443.

[22] *Manson*, 432 US at 114, citing *Biggers*, 409 US at 199-200; *Causey*, 834 F2d at 1284-1285 ("In sum, the essential question is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.") (quotation marks and citations omitted).

[23] See, e.g., *Gray*, 457 Mich at 124 (explaining that while the eyewitness "could not be one hundred percent positive at the lineup, she was sufficiently certain to be able to pick out the defendant," and "any evidence of the victim's lack of certainty would be relevant to the weight that the evidence should be given, but not to its admissibility"); *Brownlee*, 454 F3d at 140 (finding the eyewitness identifications sufficiently reliable despite the witnesses' short opportunity to view the suspect, the witnesses' misidentification of the suspect's clothing and age, and the fact that "none of the witnesses could describe the suspect's facial features or provide the police with more than a relatively general description of him"); *Howard*, 405 F3d at 474 (discussing cases where eyewitness identifications were sufficiently reliable and thus admissible despite poor opportunities to view the perpetrators and errors in the witnesses' description of the perpetrators).

## 1. THE OPPORTUNITY FOR THE WITNESS TO VIEW THE ASSAILANT AT THE TIME OF THE CRIME

Regarding the first *Biggers* factor, Jones had ample opportunity to view defendant at the time of the crime. The shooting occurred on a clear, sunny afternoon in June, and Jones had an unobstructed view of the shooting from about 20 to 25 feet away while in the back of his mother's car. When asked at trial whether he "had a pretty good . . . view of what was going on," Jones answered in the affirmative. The majority opinion concludes, with no objective support, that Jones was a mere casual observer whose opportunity to view the crime was poor. But Jones was not required to be an active participant in the events he observed in order to have a good opportunity to observe defendant.[24] In fact, the conclusion that Jones was unable to adequately view the crime as a mere casual observer is belied by the detail with which Jones was able to describe the crime. At the preliminary examination, Jones stated that the shooting occurred in "[n]o less than a minute,"[25] during which time Jones observed a Hispanic male (Casas) walk out of a store when an African-American man got out of a Jeep and fired three gunshots at Casas. The shooter's gun jammed, but after approximately five seconds, the shooter relieved the jam and fired more shots at Casas while Casas tried to flee. The driver remained in the Jeep. Jones described the shooter as an African-American male with a shaved head wearing a white t-shirt and

---

[24] *Haliym v Mitchell*, 492 F3d 680, 705 (CA 6, 2007) (stating only that courts are "more likely to find an identification reliable where a witness 'was able to view the assailant with a heightened degree of attention, as compared with disinterested bystanders or casual observers' "), quoting *Howard*, 405 F3d at 473 (quotation marks and citation omitted).

[25] I do note that at two other times during his testimony, Jones agreed with questions asking whether the shooting occurred in "less than a minute."

black cargo pants.[26] At trial, Jones conceded that the events happened in quick succession and that he did not see the shooter get back into the Jeep because Jones and his mother fled the scene to avoid the gunfire. But the facts and details provided by Jones strongly suggest that Jones had sufficient opportunity to have a clear, unobstructed view of the shooter while only a short distance away.[27] Thus, the opportunity Jones had to view defendant during the crime was more than adequate.

---

[26] Comparatively, at trial, Jones described the incident as follows:

> As we were crossing the tracks on Cumberland, we were passing a little auto body shop or whatever. And as we passed the tracks, I heard what I thought was firecrackers. And then, I didn't pay no mind to it.
>
> But then, I heard them again, so I turned around, and I see an African-American male shooting a Hispanic male. And when the firecracker—well, when the gunshots stopped, I see the Hispanic male, like, rolling in the— from the sidewalk into the street, trying to get away from it. And, as the gun unjammed when I thought it jammed, he started shooting again. And the Hispanic male just kept rolling and rolling until he just didn't roll any more.

Further, Jones testified at trial that the shooter was an African-American male with a bald head wearing a white t-shirt and "probably" black cargo pants.

[27] See *Brisco v Ercole*, 565 F3d 80, 93 (CA 2, 2009) (explaining that "fifteen to fifty feet is hardly a great distance"); *Brownlee*, 454 F3d at 139-140 (holding that even though the entire carjacking only lasted approximately 30 seconds while the witness (the victim) was focused primarily on the weapon, not the defendant, the witness still viewed the perpetrator "at fairly close range, and in broad daylight"); *Howard*, 405 F3d at 472 (finding that the witness had "a good opportunity" to observe the defendant where the witness saw him once for a "glance" from three to six feet away, once for "a split-second" from 10 to 15 feet away, and once for approximately a minute and a half from 30 to 40 feet away); *Causey*, 834 F2d at 1285 ("The record indicates that the vehicle in which [the defendant] was allegedly sitting was 20 to 30 feet from the window, and [the witness's] view was unobstructed looking inside the car."). But see *Thomas*, 501 Mich at 913 (holding that the victim's opportunity to view the assailant was inadequate where "the victim viewed the assailant's partially obscured face for no more than seven seconds on a dark city street with

## 2. THE DEGREE OF ATTENTION PAID BY THE WITNESS

As to the second *Biggers* factor, the degree of attention that Jones paid to the shooting is more difficult to discern than the majority opinion suggests. Viewing the testimony of Jones as a whole, two divergent paths emerge regarding the degree of attention he paid to the crime. The majority opinion cites the testimony of Jones at the preliminary examination to conclude that Jones was more focused on the Jeep, the driver, and the gun rather than the shooter. The majority opinion chooses this path to conclude that Jones did not pay a high degree of attention to the crime. An alternative path that emerges from the testimony of Jones, the one the jury chose, suggests that Jones was paying attention to the incident as a whole, not everything except the shooter. This is evidenced by the way Jones recounted the crime and his description of the shooter. This path provides sufficient indicia of reliability under the second *Biggers* factor. Where the testimony of a witness presents different, plausible versions of what the witness observed, this Court should defer to the jury to choose which version to believe.[28]

---

no streetlights while a gun was pointed at him"); *United States v Greene*, 704 F3d 298, 310 (CA 4, 2013) (holding that the witness "had a limited opportunity to view the robber, given the robber's disguise, his brief amount of time in the bank, and the presence of [a] firearm").

[28] See *People v Young*, 472 Mich 130, 143; 693 NW2d 801 (2005) ("Fundamentally, it is the province *of the jury* to assess the credibility of witnesses."). To be sure, the jury could have determined that the degree of attention paid by Jones was inadequate. But the point of this reliability inquiry is to keep identifications that are wholly unreliable from going to the jury, not to exclude less-than-perfect identifications altogether simply because there are questions left for the jury to resolve.

Further, while not an enumerated *Biggers* factor, the testimony of Jones reveals that he was relatively calm while witnessing the shooting.[29] Jones testified that this was not the first time he had heard gunshots, and when asked by defense counsel, Jones stated that he was not disturbed by the shooting. In fact, Jones prompted his mother, who was a nurse, to return to the scene to render aid to Casas. Once at the scene, Jones began counting the empty shell casings, as he had apparently been taught to do in educational courses in criminal justice and criminal investigation.[30] In sum, that "Jones's attention was drawn to the shooting"[31] did not affect the attention to detail Jones paid to the crime and its actors, as evidenced by the detail with which Jones described the shooting.

### 3. THE ACCURACY OF THE PRIOR DESCRIPTION OF THE ASSAILANT MADE BY THE WITNESS

Regarding the third *Biggers* factor, the description of the shooter that Jones provided to the police accurately matched defendant. When Bridgeport Township Officer Tyler Poirer pulled over the Jeep in which Ramsey and defendant were traveling, defendant was

---

[29] The fear and stress of a witness while observing a crime may affect the ability of the witness to accurately perceive the crime and its participants. See *Perry*, 565 US at 243 (stating that "whether the witness was under stress when he first encountered the suspect" is one factor bearing on the likelihood of misidentification); *Greene*, 704 F3d at 308 (stating that the degree of attention paid by the witness "to the robber at the time of the offense was greatly diminished due to her reasonable fear and the distraction of having a weapon pointed at her"). Here, however, Jones remained calm.

[30] See *Kurylczyk*, 443 Mich at 308 (opinion by GRIFFIN, J.) (finding the identification reliable in part because there was no evidence that the eyewitnesses "were panicked or otherwise psychologically debilitated by the crime" and noting that the eyewitnesses—bank tellers—relied on their training and reacted calmly during the bank robbery).

[31] *Ante* at 18.

wearing a white t-shirt and black shorts and he appeared to have a shaved head, or at least a very short hairstyle. Significantly, even general descriptions of physical characteristics and external features, such as the shooter's clothing, can be evidence in favor of reliability.[32] The only aspect of defendant's appearance that arguably did not match the description of the shooter provided by Jones was the fact that defendant wore shorts when he was apprehended, not pants. All other aspects of that description accurately matched defendant, and this minor distinction goes to the weight afforded to this testimony, not to its reliability and admissibility.[33]

The majority opinion goes astray by focusing too heavily on the fact that Jones misidentified the license plate of the Jeep in which the assailants fled and on the fact that Jones erroneously described Ramsey as weighing between 280 and 320 pounds and having

---

[32] See *Brisco*, 565 F3d at 92 (explaining that even a minimal description of physical characteristics can be sufficient, stating "[t]he physical description provided by the victim substantially matched petitioner's characteristics insofar as [petitioner] is a white male, five feet, ten inches tall, 'stocky,' and has brown hair"); *Brownlee*, 454 F3d at 134-135 (where four witnesses identified the suspect as a young black male, possibly in his thirties, wearing a dark t-shirt and a baseball cap at the time of the carjacking, these generalities of the witnesses' descriptions of the suspect went more toward the weight of the identifications than reliability); *Howard*, 405 F3d at 473 (finding the description of the defendant by the witness sufficiently accurate where the witness described the perpetrator as " 'a black man with tan shorts on,' " holding a " 'real short' " rifle with a clip, and having a distinctive " 'short flat-top' " haircut).

[33] See *Brownlee*, 454 F3d at 140 (finding the carjacking victim's identification of the defendant sufficiently reliable despite the victim describing her assailant as wearing shorts, whereas the defendant wore blue jeans). The majority opinion takes issue with the general description of the shooter provided by Jones, emphasizing that Jones was unable to identify any specific physical characteristics of the shooter. While the description of the shooter offered by Jones only included the shooter's general physical characteristics of race, gender, and hairstyle, the fact remains that this description accurately matched defendant.

a beard while he actually weighed about 150 pounds and had short facial hair stubble. But these discrepancies are substantially less relevant considering that the other characteristics of the Jeep provided by Jones accurately matched Ramsey's Jeep. More significantly, Jones did not identify Ramsey at the showup. Jones only identified defendant. Thus, with respect to defendant, the description offered by Jones was reasonably accurate.[34]

## 4. THE LEVEL OF CERTAINTY THE WITNESS SHOWED AT THE PRETRIAL IDENTIFICATION PROCEDURE

As to the fourth *Biggers* factor, there is no evidence in the record regarding the level of certainty Jones displayed when he identified defendant as the shooter. At trial, Detective Sergeant Rivard simply testified that Jones identified defendant as the shooter. In contrast, Jones denied ever making the identification. Because there is no evidence regarding the level of certainty Jones possessed at the time of the pretrial identification procedure, this

---

[34] Further, while other evidence of guilt plays no part in the determination of whether the identification of defendant by Jones was reliable, it cannot be overlooked that defendant was the *passenger*, not the driver, of the Jeep that Officer Poirer pulled over just 11 minutes after receiving the dispatch call about the shooting. See *Manson*, 432 US at 116 ("Although it plays no part in our analysis, all this assurance as to the reliability of the identification is hardly undermined by the facts that respondent was arrested in the very apartment where the sale had taken place, and that he acknowledged his frequent visits to that apartment."). Also, Rosei Watkins—another witness to the murder—positively identified Ramsey's Jeep as the one she saw fleeing the murder scene and testified at trial that the shooter's hairstyle was "short cut." Watkins also testified that the driver was of normal build, which would be contrary to the assessment of the driver given by Jones. But when asked whether Watkins thought the driver was "as tall as 6-feet-5-inches," Watkins testified that she "d[id]n't think *they* was [sic] that tall." (Emphasis added.) Although Watkins made this statement while being questioned about the height of the driver (Ramsey), it is possible that her use of the word "they" indicated that she was referring to the height of both assailants.

15

factor does not weigh for or against the reliability of the identification of defendant by Jones.

## 5. THE LENGTH OF TIME BETWEEN THE CRIME AND THE CONFRONTATION

Regarding the fifth *Biggers* factor, that Jones identified defendant approximately four or five hours after the shooting occurred weighs in favor of reliability. This time span between Jones witnessing the shooting and his identification of defendant at the police station is extremely brief. Thus, the identification was made while the shooting was fresh in the mind of Jones. This Court has found reliable an identification that occurred roughly two weeks after the crime.[35] Even where almost a month passes between the crime and the identification, we have held that this "relatively short period . . . ensures that the crime was still fresh in the victim's mind . . . ."[36] This is not a case in which weeks or even months passed between the crime and the confrontation.[37] Jones identified defendant the same day he observed the murder of Casas, identifying defendant as the shooter within hours of the crime. This factor undoubtedly and strongly weighs in favor of reliability.

---

[35] *Kurylczyk*, 443 Mich at 307-308 (opinion by GRIFFIN, J.).

[36] *Gray*, 457 Mich at 120.

[37] *Manson*, 432 US at 116 (identification occurred within two days of crime); *Howard*, 405 F3d 459 ("Three months is not a great length of time between an observation and identification."). But see *Biggers*, 409 US at 201 (holding that while a seven-month lapse between the crime and confrontation would be "a seriously negative factor in most cases," the fact that the witness had not made a previous identification demonstrated that "[h]er record for reliability was . . . a good one"); *Greene*, 704 F3d at 309 (finding that a 17-month delay between the crime and the identification constituted "an unquestionably lengthy period of time that must weigh against reliability").

## 6. THE TOTALITY OF THE *BIGGERS* FACTORS

Weighing these factors under the totality of the circumstances and against the corrupting effect of the overall suggestiveness of the identification process demonstrates that the identification of defendant by Jones retained strong indicia of reliability such that the suggestiveness of the showup did not lead to a substantial likelihood of misidentification. Jones identified defendant as the shooter while the incident was still very fresh in his mind. Jones had an unobstructed view of defendant during daylight hours. The opportunity of Jones to view the shooter was admittedly brief as the crime occurred quickly and while Jones and his mother fled from gunfire. But Jones, who was relatively calm throughout the incident, nonetheless had sufficient time to view the shooting and provide police with a general description of the physical characteristics and clothing of the shooter that ultimately matched defendant. In sum, the police station identification procedure was not so unduly suggestive that it outweighed its reliability. Any shortcomings in the identification procedure go to the weight of the evidence, not its admissibility.[38] Accordingly, the trial court and the Court of Appeals properly concluded that the evidence showing that Jones identified defendant as the shooter was admissible.

---

[38] See *Cooper v Bergeron*, 778 F3d 294, 305 (CA 1, 2015) ("It is not uncommon . . . for a witness identification to involve an unduly suggestive procedure, as well as other circumstances that may weaken the accuracy of the witness's recall, that—when viewed on the whole—nevertheless do not undermine the reliability of the evidence for purposes of admitting it at trial for the jury to decide its weight."); *Brownlee*, 454 F3d at 140 ("The generality of the witnesses' descriptions of the suspect, the relatively short period of time they saw him, and the other shortcomings pertaining to their identifications, go more to the weight of the evidence than the reliability of their identifications, and thus were issues for the jury."); *Causey*, 834 F2d at 1285 (holding that the defendant's claims for why the single photographic identification of him by the witness was unreliable "go to the *weight* the

Given this conclusion, it is not necessary to discuss whether any error in admitting the identification made by Jones was harmless beyond a reasonable doubt. I am compelled, however, to address the majority opinion's concerns with juries being so susceptible to eyewitness identifications that they place "disproportionate weight" on such evidence.[39] The lack of faith in our jury system exhibited in the majority opinion is perplexing. As the Supreme Court of the United States explained in *Manson v Brathwaite*:

> Surely, we cannot say that under all the circumstances of this case there is a very substantial likelihood of irreparable misidentification. Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.[40]

We trust juries to make difficult credibility and reliability determinations every day, and I fail to see why this case should be any different.[41] The only unique aspect of this case is testimony from Jones that he never identified defendant as the shooter at the police station, thus causing evidence of his identification to be admitted through Detective Sergeant Rivard. But our rules of evidence specifically account for a situation like this, permitting prior statements of identification to be used as substantive evidence of guilt as

----

testimony should be given by the jury and do not render the testimony so unreliable as to mandate its exclusion").

[39] *Ante* at 22.

[40] *Manson*, 432 US at 116 (quotation marks and citation omitted).

[41] See *Perry*, 565 US at 245 ("[T]he jury, not the judge, traditionally determines the reliability of evidence."); *Young*, 472 Mich at 143 (holding that the credibility of a witness is an assessment reserved for the jury).

long as the declarant (Jones) is subject to cross-examination regarding the identification.[42]

It makes no difference whether the declarant's testimony at trial is consistent with the prior statement of identification.[43] There are many situations in which the story of a witness may change during the course of a criminal prosecution, and I decline to speculate why a discrepancy exists here. As in any other criminal prosecution, the jury here was tasked with weighing the reliability of the identification, as well as examining the demeanor, credibility, and veracity of both Jones and Detective Sergeant Rivard as they each testified.

Finally, numerous constitutional and evidentiary safeguards "caution juries against placing undue weight on eyewitness testimony of questionable reliability."[44] These safeguards include defendant's right to confront and cross-examine the witnesses against him;[45] his right to the effective assistance of counsel, who can place doubt in the jurors' minds through cross-examination, opening statements, and closing arguments;[46] an

---

[42] MRE 801(d)(1)(C).

[43] *People v Malone*, 445 Mich 369, 377; 518 NW2d 418 (1994) ("[S]tatements of identification are not limited by whether the out-of-court declaration is denied or affirmed at trial.").

[44] *Perry*, 565 US at 245.

[45] See US Const, Am VI; Const 1963, art 1, § 20; *Perry*, 565 US at 245-246, quoting *Maryland v Craig*, 497 US 836, 845, 110 S Ct 3157, 111 L Ed 2d 666 (1990) (" 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant.' "); *People v Fackelman*, 489 Mich 515, 528; 802 NW2d 552 (2011) (" 'The right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials.' "), quoting *Lee v Illinois*, 476 US 530, 540; 106 S Ct 2056; 90 L Ed 2d 514 (1986).

[46] US Const, Am VI; Const 1963, art 1, § 20; *Perry*, 565 US at 246; *Kurylczyk*, 443 Mich at 316 (opinion by GRIFFIN, J.) (holding that "any defects in the eyewitness identifications

eyewitness-specific jury instruction, which instructs jurors on how to weigh identification evidence and to accord whatever weight, if any, they believe the identification deserves;[47] evidentiary rules that exclude relevant evidence if its probative value is outweighed by its prejudicial effect;[48] and the prosecution's burden of having to prove defendant guilty beyond a reasonable doubt.[49] While these constitutional and evidentiary safeguards do not displace the trial court's initial gatekeeper role to screen a police-arranged pretrial identification procedure for reliability, these safeguards ensured that the jury carefully weighed the reliability of the identification of defendant made by Jones rather than affording it "disproportionate weight," as the majority opinion concludes.[50]

---

were brought out by defendant's counsel," who "vigorously cross-examined the witnesses and attacked their credibility").

[47] *Perry*, 565 US at 246 ("Eyewitness-specific jury instructions . . . warn the jury to take care in appraising identification evidence."); see also M Crim JI 7.8.

[48] See MRE 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

[49] *Perry*, 565 US at 247 ("The constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt also impedes convictions based on dubious identification evidence."); see also *People v Denson*, 500 Mich 385, 401; 902 NW2d 306 (2017) ("The prosecution bears the burden of proving every element of a charged offense beyond a reasonable doubt.").

[50] *Perry*, 565 US at 237 ("The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.").

## IV. CONCLUSION

When viewed in totality and weighed against the corrupting effect of the suggestive identification itself, the identification of defendant made by Jones retained strong indicia of reliability and did not lead to a substantial likelihood of misidentification. The trial court properly admitted Detective Sergeant Rivard's testimony regarding this identification, allowing the jury to consider its ultimate weight. For these reasons, I would affirm the trial court and Court of Appeals, and I would affirm defendant's conviction and sentence.

Brian K. Zahra
Stephen J. Markman